# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### OCTOBER SESSION, 1998



FILED

December 28, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **SYLVESTER SMITH,** | ) | |
| | ) | **No. 02C01-9801-CR-00018** |
| **Appellant** | ) | |
| | ) | **SHELBY COUNTY** |
| **vs.** | ) | |
| | ) | **Hon. Bernie Weinman, Judge** |
| **STATE OF TENNESSEE,** | ) | |
| | ) | **(POST-CONVICTION)** |
| **Appellee** | ) | |


For the Appellant:

**William P. Redick, Jr.**
P. O. Box 137
Whites Creek, TN  37189

**Peter D. Heil**
P. O. Box 40651
Nashville, TN  37204

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Amy L. Tarkington**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

**Thomas Hoover**
Asst. Attorney General
Criminal Justice Complex
Suite 301, 201 Poplar Street
Memphis, TN  38103


OPINION FILED: _____

REVERSED; CONVICTION VACATED; REMANDED FOR NEW TRIAL


**David G. Hayes**
Judge

**OPINION**

In this capital case, the appellant, Sylvester Smith, appeals as of right the judgment of the Criminal Court of Shelby County denying his petition for post-conviction relief. In 1991, the appellant was convicted of felony murder, and, following a separate sentencing hearing, was sentenced to death by electrocution. The appellant's conviction and sentence were affirmed on direct appeal by the Tennessee Supreme Court. See State v. Smith, 893 S.W.2d 908 (Tenn. 1994), reh'g denied, (1995), cert. denied, 516 U.S. 829, 116 S.Ct. 99 (1995).

The appellant filed the instant petition for post-conviction relief on April 18, 1995. An amended petition was filed on September 16, 1996. A hearing was held on September 24-26, 1996. On May 19, 1997, the post-conviction court entered an order denying the appellant post-conviction relief.

On appeal, the appellant raises the following issues:[1]

I. Whether the appellant was denied his constitutional rights at sentencing when the trial court limited the testimony of his sole mitigation witness;

II. Whether the appellant was denied his constitutional right to trial by an impartial jury;

III. Whether constitutional errors not addressed by the post-conviction court entitle the appellant to relief;

IV. Whether the appellant was denied his constitutional rights during the guilt and sentencing phases by the prosecution's failure to provide the defense exculpatory and impeachment materials;

V. Whether the appellant received the effective assistance of counsel at trial and on appeal;

VI. Whether the cumulative effect of all errors violated the appellant's constitutional rights.

---

[1]Contained within the appellant's six general issues are ninety-one plus allegations of error set forth as sub-issues.

In this appeal, the State concedes error at the sentencing phase of this capital trial. We agree. Moreover, after careful review of the record, we also find error at the guilt phase of the trial. Accordingly, the appellant's conviction and sentence are vacated. This cause is remanded for a new trial.

## Background

The proof, as set forth in the supreme court's decision, State v. Smith, 893 S.W.2d at 911-912, established that Mrs. Olive Brewer, an elderly widow, lived alone in a house on Winchester Road in Memphis. On Sunday, July 2, 1989, Mrs. Brewer attended church, ate lunch with a friend, and went to the grocery store before returning home. Mrs. Brewer was wearing a diamond ring when she left the restaurant.

Later that evening, Memphis Police Officer Steve Perry noticed a vehicle stuck in the mud in the woods next to Mrs. Brewer's house. The vehicle's engine was still warm and it appeared obvious that someone had been trying to get the car out of the mud. Officer Perry also observed a stereo and television set on the ground beside the vehicle and a television stand on the front seat of the car.

Officer Perry discovered that the vehicle was registered to Mrs. Brewer who lived next door and he and another officer decided to check Mrs. Brewer's residence. The two officers found the back door of Mrs. Brewer's house ajar. A search of the house led to the discovery of Mrs. Brewer's body lying in one and one-half to two inches of bloody water in the bathtub. A blue blanket was over her face and her dress was pulled above her hips. Mrs. Brewer had been beaten over her entire body and her throat was lacerated.

3

In the front bedroom, the officers discovered large bloodstains at the head and foot of the bed. Strips of torn sheet and a rope were lying on the floor. One of the strips was blood soaked. A used condom was found in the bedroom closet. In the kitchen, the officers found evidence of blood on a knife, and, in the living room, they discovered another knife in a chair.

Fingerprints on the bathroom sink and on the front hood of the victim's car matched the appellant's prints. The appellant's sister identified the knife found in the living room as resembling one of her own that had been missing. The appellant's niece testified that the appellant had told her that "he cut this lady's throat and put her in a bathtub full of water."

Shortly after the murder, the appellant offered to sell Willie Cox a lady's diamond ring and three necklaces. The appellant informed Cox that the jewelry had come "out of the lady's house on Winchester." He continued to tell Cox that he had killed the woman because "he don't leave no witnesses." He then described cutting her throat, tying her hands, and putting her in the bathtub. He also stated that he had placed an electrical appliance in the bathtub with her.

When confronted about the murder, approximately one year later, the appellant denied any knowledge of the murder, denied knowing the victim, and denied ever being in her house. He also denied that the fingerprints were his. The Shelby County Public Defender's Office was appointed to represent the appellant.[2]

During the guilt phase of his subsequent trial, the appellant elected not to testify nor did he offer any evidence. Based on the evidence presented by the State, the jury found the appellant guilty of felony murder committed during the course of a robbery.

---

[2]The defense team consisted of Robert Jones (lead counsel), Carolyn Watkins (co-counsel), and two staff investigators.

At the sentencing phase of the trial, the State introduced proof that the appellant had previously been convicted of robbery with a deadly weapon, assault with intent to commit first degree murder, and aggravated rape. Photographs were also introduced depicting numerous bruises and the fatal wounds on the victim's body. The pathologist testified that the victim would have been alive at the time that the water entered her lungs and that she could have lived hours after the lacerations to her throat were inflicted.

The defense introduced the testimony of Dr. Hutson, a clinical psychologist who had administered the Stanford-Binet Intelligence test to the appellant. The test indicated that the appellant had an IQ of 54. School records showed that in the third grade the appellant had an IQ of 72, and of 67 in the fifth grade. A parole evaluation described the appellant as having mild to moderate impairment in intellectual function. The psychologist testified that the appellant would be classified as mentally retarded, that the appellant's intellectual capacity was diminished, and that this impairment was a mental defect.

The jury found that the appellant had previously been convicted of a violent felony, the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, and that the murder was committed in the commission of another felony. Finding no mitigating factors sufficiently substantial to outweigh the statutory aggravating circumstances, the jury sentenced the appellant to death by electrocution.

On direct appeal to the Tennessee Supreme Court, the court, under its mandate in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), cert. denied, 510 U.S. 124, 114 S.Ct. 651 (1993), found that the jury's consideration of Tenn. Code Ann. § 39-13-204(i)(7) was improper. See Smith, 893 S.W.2d at 924-925. Nonetheless, the court held that the error in applying this factor was harmless in light of the two remaining valid aggravating circumstances. Id.

5

**Post-Conviction Hearing**

In post-conviction proceedings, the appellant must prove the allegations contained in his petition by a preponderance of the evidence.[3] State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1991); Oliphant v. State, 806 S.W.2d 215, 218 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1991). Findings of fact and conclusions of law made by the post-conviction court are given the weight of a jury verdict, and, this court is bound by those findings unless the evidence contained in the record preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990); Teague v. State, 772 S.W.2d 932, 934 (Tenn. Crim. App. 1988), cert. denied, 493 U.S. 874, 110 S.Ct. 210 (1989). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Questions concerning the credibility of witnesses and the weight and value to be given their testimony are for resolution by the post-conviction court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

**I. Limitation of Mitigating Evidence during Sentencing Phase**

The appellant contends that the trial court committed error by limiting the testimony of the clinical psychologist, Dr. Hutson, during the sentencing phase of the trial with regard to mitigating evidence. The appellant concedes that this issue was predetermined by the supreme court in Smith, 893 S.W.2d at 921-922. However, he argues that, in light of subsequent decisions by the Tennessee Supreme Court in State v. Odom, 928 S.W.2d 18 (Tenn. 1996) and this court in State v. Sledge, No. 02C01-9405-CR-00089 (Tenn. Crim. App. at Jackson, Nov. 25, 1997), this issue should not be treated as previously determined.

---

[3]Again, the appellant's petition for post-conviction relief was filed on April 18, 1995. Because it was filed prior to May 10, 1995, it is governed by Tenn. Code Ann. § 40-30-101 et seq. (repealed 1995), rather than the revised Post-Conviction Procedure Act, Tenn. Code Ann. § 40-30-210 et seq. (1997). Under the current statute, the standard is "clear and convincing evidence." Tenn. Code Ann. § 40-30-210(f).

In Odom, 928 S.W.2d at 27-28, mitigation evidence was limited by the trial court regarding the family background of the defendant as testified to by the clinical psychologist because the trial court ruled the information was hearsay.[4] The supreme court under the provisions of Tenn. Code Ann. § 39-13-204(c) held that the hearsay evidence was relevant and, therefore, admissible. As such, the error was not harmless. Odom, 928 S.W.2d at 28.

In Sledge, No. 02C01-9405-CR-00089, the trial court rejected the proffered testimony of a Psychological Chaplain II, employed by the Department of Correction, as an expert on the defendant's remorsefulness based upon his self-developed testing procedure. However, the court acknowledged his ability to testify to his personal observations of the defendant as a pastoral counselor. Id. During a hearing out of the jury's presence, the witness related his knowledge of pertinent background information of the defendant and his observations of the defendant in a prison environment. Id. The trial court refused to allow the witness to testify further and dismissed him. Id. The following day, the trial court recanted its ruling and decided to allow the witness to testify regarding his personal observations arising out of his counseling and interviews with the defendant; however, the witness could not be found. Id. This court, citing Odom, held the refusal to allow the witness to testify constituted reversible error. Id.

In the matter before us, at the appellant's trial, Dr. Hutson testified that he only spoke with the appellant for a "few minutes" and administered the IQ test. Dr. Hutson stated, "I really didn't go into any background details or anything of that nature." Contrary to the appellant's assertion that Odom and Sledge present a "change in the law," we conclude that this issue was previously determined by the supreme court on direct appeal. See Smith, 893 S.W.2d at 921-922. Accordingly, because a new constitutional right had not been created, this issue may not be relitigated within the

---

[4]We note that both Odom and the instant case involve both the same trial judge and the same clinical psychologist.

7

post-conviction context.  <u>See</u>  Tenn. Code An. § 40-30-111,-112; Tenn. Code Ann. § 40-30-105.

## II. Superficial Jury Selection

Next, the appellant contends that the trial court and defense counsel deprived him of an impartial jury based upon volumes of research by Dr. Michael Blankenship regarding jurors' lack of comprehension of jury instructions.  Moreover, he argues that the trial court should have permitted individual voir dire because of the findings of Dr. Blankenship's studies.[5]

The State contends that any issues regarding jury selection were previously determined by the supreme court, <u>see</u> <u>Smith</u>, 893 S.W.2d at 914-16, or have been waived pursuant to Tenn. Code Ann. § 40-30-112(b)(1) and (2).  We agree with the State's position on waiver.  These issues could have been raised by the appellant on direct appeal.  Moreover, the appellant has failed to provide a basis for a rebuttable presumption overcoming the waiver of these issues.  Thus, they are inappropriate for our determination of post-conviction relief.  This issue is without merit.

---

[5]He contends that either the prosecution, defense counsel, or the court should have questioned the jurors regarding:

(1) whether the jurors  would be able to consider mitigating evidence and a life sentence if they found the defendant guilty of first-degree murder;

(2) whether the jurors would be able to consider mitigating evidence and a life sentence after first finding the defendant guilty of first degree murder and then finding beyond a reasonable doubt the existence of one or more statutory aggravating circumstances;

(3) whether the jurors were capable of understanding what mitigating circumstances mean;

(4) whether the jurors were capable of understanding the different burdens of proof for the prosecution in the proof of aggravating circumstances versus that for the defense in the proof of the mitigating circumstances;

(5) whether the jurors were capable of understanding their obligations concerning the difference between the unanimity requirement of the jury's verdict in the determination of aggravating circumstances versus that in the determination of the mitigating circumstances;

(6) whether the jurors were capable of the "weighing" of the aggravating and the mitigating circumstances, e.g., that it is a qualitative, not a quantitative analysis; and

(7) whether the jurors were capable of understanding the instructions with regard to non-enumerated mitigating circumstances.

8

### III. Issues Not Addressed by the Post-Conviction Court[6]

The appellant asks this court to review the following errors he alleges were committed by both the trial court and the prosecution:

By the trial court:

1. The trial court erred by not *sua sponte* taking the precautions necessary to make a determination of the appellant's competency to stand trial;
2. The trial court erred by making repeated displays of hostility toward and bias against the defense;
3. The trial court erred by limiting the testimony of the psychologist during the pretrial hearing on the issue of whether the appellant is mentally retarded;
4. The appellant is not eligible to be sentenced to death because he is mentally retarded;
5. The trial court erred by refusing to consider and rule on pretrial motions;
6. The trial court erred in its charge to the jury;
7. The trial court gave erroneous and misleading definitions of "reasonable doubt;"
8. The trial court erred by overruling defense objections to the prosecution's referring to the death penalty as a "necessary law" during the voir dire;
9. The trial court erred by denying the defense an opportunity to make an offer of proof at the close of the "Batson hearing" during voir dire;
10. The trial court erred by employing leading questions and excusing for cause prospective jurors who were opposed to the death penalty;
11. The trial court erred by overruling the defense motion for continuance based on the need to investigate exculpatory evidence withheld by the prosecution until the first day of trial;
12. The trial court erred by allowing the introduction of irrelevant, cumulative, and/or prejudicial evidence;
13. The trial court erred by giving instructions that relieve the prosecution of its burden of proving all elements of the offense beyond a reasonable doubt;
14. The trial court erred by overruling defense objection to prosecutional misrepresentation in its penalty phase closing argument.

By the prosecution:

1. The prosecution failed to disclose evidence to which the appellant was entitled before, during, and after the trial.
2. The prosecution possessed information exculpatory to the defendant concerning Willie Lee Cox.
3. The prosecution failed to turn over to the defense other evidence exculpatory to the defense;

---

[6]Allegations of ineffective assistance of trial counsel raised under this heading are addressed generally under the heading of ineffective assistance of counsel.

9

4. The prosecution's arguments and conduct misstated or caused misstatements of facts and law and misled the jury;

5. The District Attorney's Office for Shelby County has no formal policy, standards, or criteria for selecting defendants who will be subjected to capital prosecution.

Additionally, the appellant makes eight general challenges regarding the constitutionality of Tennessee's death penalty statutes.

The appellant's allegations raised under these subsections must be considered waived for failure to provide citation to the record, explanation, argument or citation to any legal authority. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). This court will not speculate as to the argument supporting these allegations, nor will this court delineate the issues for the appellant from an extensive record. Additionally, issues specifically raising allegations of improper jury selection, jury instructions, prosecutorial misconduct during closing argument, and our supreme court's review of Tennessee's death penalty statutes have been addressed on direct appeal by our supreme court. See Smith, 893 S.W.2d at 914-916, 920-921, 922-923, 924-927. Issues that have been previously determined on direct appeal cannot support a petition for post-conviction relief and are, therefore, excluded. See Tenn. Code Ann. §40-30-111,-112 (a); State v. Denton, 938 S.W.2d 373, 377 (Tenn.1996); House v. State, 911 S.W.2d 705, 710 (Tenn. 1995), cert. denied, 517 U.S. 1193, 116 S.Ct. 1685 (1996). Finally, we note that the majority of the appellant's exhaustive list of allegations have already been raised elsewhere in the petition and on appeal, e.g., alleged Brady violations, competency, mental retardation.

Accordingly, all unsupported allegations raised by the appellant are waived.

**IV. Alleged Brady/Giglio Violations**

10

The appellant alleges that the State withheld exculpatory evidence thereby violating Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963). Specifically, the appellant argues that (1) the State withheld the statement of Alice Cooper and (2) the State failed to disclose an alleged deal with Willie Lee Cox in exchange for his testimony.

In Brady, 373 U.S. at 83, 83 S.Ct. at 1194, the Supreme Court held that the prosecution has a duty to furnish the defendant with exculpatory evidence relating either to the defendant's guilt or innocence or to the potential punishment that may be imposed. See also Bell v. State, No. 03C01-9210-CR-00364 (Tenn. Crim. App. at Knoxville, Mar. 15,1995), perm. to appeal denied, (Tenn. Aug. 28, 1995). Exculpatory evidence includes information or statements of witnesses which are favorable to the defendant. See, e.g., McDowell v. Dixon, 858 F.2d 945 (4th Cir. 1988), cert. denied, 489 U.S. 1033, 109 S.Ct. 1172 (1989); State v. Goodman, 643 S.W.2d 375, 379-380 (Tenn. Crim. App. 1982). Additionally, under Giglio v. United States, 405 U.S. 150, 154-155, 92 S.Ct. 763, 766 (1972), exculpatory evidence includes information which can be used for impeachment purposes only. See also Davis v. State, 823 S.W.2d 217, 218 (Tenn. Crim. App. 1991). Failure to reveal exculpatory evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady, 373 U.S. at 87, 83 S.Ct. at 1196-1197. In order to determine the materiality of undisclosed information, the reviewing court must ascertain whether "in [the] absence [of the information] [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566 (1995). See also State v. Edgin, 902 S.W.2d 387, 390 (Tenn.), as amended on reh'g, (1995). Thus, in order to prove a *Brady* violation, a defendant must show the "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id.

11

In order for this court to find a Brady violation, four requirements must be satisfied:

> (1) The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> (2) The State must have suppressed the information;
> (3) The information must have been favorable to the accused; and
> (4) The information must have been material.

Edgin, 902 S.W.2d at 390. The appellant bears the burden of demonstrating the elements of this claim by a preponderance of the evidence. See Smith v. State, 757 S.W.2d 14, 19 (Tenn. Crim. App. 1988).

At the post-conviction hearing, Carolyn Watkins, appellant's defense counsel at trial, testified that she oversaw the preparation of the pretrial motions, including a *Brady* motion and a *Giglio* motion regarding discovery of exculpatory information. These motions were not heard by the trial court because they were not set in advance of the trial. But see , *infra,* Section V, Ineffective Assistance of Counsel. Both Watkins and Assistant District Attorney General Harris, lead counsel for the State, testified that the defense had "open file discovery" in which she took notes, looked through the file, and copied several items. Watkins was satisfied that she had received everything in discovery. Harris testified that nothing was taken from the file or hidden from Watkins.

## A. Alice Cooper's Statement

In Ms. Cooper's statement to the police contained within a supplemental offense report, she advised that she had overheard four young men, between nineteen and twenty-five years old, across the street from the victim's home talking about killing "that old bitch." Two of the boys claimed they had killed her in the bed and placed her body in the bathtub. Ultimately, the police identified one of the individuals. The prosecutor provided the defense with a summary of this statement following jury selection but

before any proof was presented.[7]   At the post-conviction hearing, Jones, defense counsel, recalled receiving this information before the trial; and afterwards, he moved for a continuance which the court denied.

The State, citing United States v. Bencs, 28 F.3d 555 (6th Cir. 1994), argues that this information does not fall within the parameters of *Brady* because the information was disclosed, although delayed.  We agree.  *Brady* only applies to a complete failure to disclose exculpatory information and normally does not apply to delayed disclosure, only violating *Brady* if the delay itself causes prejudice.  State v. Inman, No. 03C01-9201-CR-00020 (Tenn. Crim. App. at Knoxville, Nov. 23, 1993), perm. to appeal denied, (Tenn., April 4, 1994) (citing United States v. Word, 806 F.2d 658, 665 (6th Cir. 1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1383 (1987)); see also State v. Ewing, No. 01C01-9612-CR-00531 (Tenn. Crim. App. at Nashville, June 19, 1998), vacated and reentered, (Tenn. Crim. App. at Nashville, Aug. 18, 1998).

---

[7]JONES: Your Honor, this is definitely exculpatory information.  We haven't had an opportunity to check out.  We would ask the Court to allow us time to check this out before we go forward.

COURT: Mr. Jones, you've had since October the 19th, 1990, to have hearings on motions, which you did not do.  You've waived your rights to have a hearing on the motion.  You can have all the time you want, but we're not going to delay the trial for your now investigating something you should have done in October of 1990.

JONES: Your Honor, this information was not available to us.

COURT: It was certainly available under the discovery procedures.

JONES: Your Honor, it wasn't turned over to us.

COURT: If you didn't make a motion to hear the motion on it, Mr. Jones.

JONES: The discovery only requires a request, and it was filed in October.  We did request it.  We didn't get it.  Also we have numerous Jencks Act statements or supplements here.

COURT: You didn't ask for Jencks Act by way of a motion since October of 1990.

JONES: Your Honor, the rules says [sic] that the Jencks Act is supposed to be turned over to us after the witness testifies.  Mr. Harris turned it over to us about an hour ago because they were numerous.  I'm requesting additional time to review this because of the exculpatory information that I've found at this time, your Honor. . . .

HARRIS: First of all, the information that he's referring to the supplements, is not exculpatory.  The people that are -- you named, the people that are -- you referred to are not named.  It's hearsay.  It's one party saying one other party heard a third party say something, so it's at least third-hand hearsay and that -- and it's not exculpatory because it's not admissible evidence, number one.  Number two, we gave the Jencks Act material to him on this one particular witness at ten o'clock this morning for him to review so we would not delay the trial.  I would suggest, your Honor, that he do exactly what Mr. Carter and I are going to have to do during lunch, that is, work on the case. . . . I called him and got in touch with him as soon as I could this morning and gave it to him, and he's had it.  We gave it to him.  Your Honor, he's not entitled to read it anyway until after the witnesses testify.  We gave it to him to accommodate the Court and jury so they wouldn't have to sit here and so your Honor wouldn't have to sit here and watch him read thirty or forty supplements.  That's why we did that, to facilitate the case.

COURT: We'll go forward with the trial, Mr. Jones.  You will have plenty of time if you want to exercise your time judiciously.

13

In the case *sub judice*, only a delayed disclosure was involved before any proof was presented. Therefore, no *Brady* violation exists unless the appellant can demonstrate prejudice. At the post-conviction hearing, no physical evidence was presented connecting this identified declarant to the crime nor was Ms. Cooper called to testify for the appellant. We will not speculate as to the veracity of this "overheard" statement. Thus, we conclude no prejudice resulted undermining the confidence of the trial from the State's delayed disclosure of this statement. This issue is without merit.

### B. Deal with Willie Lee Cox

At the post-conviction hearing, Officer Cook testified that Willie Lee Cox provided him with the information regarding the perpetrator of the murder of Olive Brewer. In return for this information, the officer testified, "[t]he only thing that I told Mr. Cox was that if his information was good, then I would write a letter to the attorney general advising the attorney general of the assistance that he had given us in the past." From the supplemental offense report dated July 24, 1990,

> Cox was wanting to wait for his attorney to show up because he was afraid he would not get credit for furnishing the information that might solve this homicide. However, we [officers] insured him [Cox] we would make sure he got credit for anything he was able to tell us that was the truth.

Officer Cook further stated to Cox, "I can't make you any promises, I can't make you any deals." Officer Cook, in fact, wrote that letter on July 30, 1990, to District Attorney General Hugh Stanton.[8] This letter referred to information provided by Cox in relation to three other cases besides the information identifying the appellant in the murder of Olive Brewer.

---

[8]When this letter was written, the appellant had not been indicted for murder. The letter provides in pertinent part:

> As you can see, Willie Cox has furnished valuable information on numerous occasions and has never, to my knowledge, asked for anything in return. He has developed into a good, reliable source of information, and I would appreciate any assistance in this case that you deem feasible. Willie Lee Cox, Jr., male black, date of birth 2-9-69, is presently incarcerated in the Shelby County jail for second degree murder, reckless driving, driving while license revoked/suspended under booking number 90091080. The second degree murder case is set in division 5 for 8-14 of '90, and the other charges are set in division 3 for 9-4-90.

During their ongoing investigation, the police had concluded that the perpetrator was a lone black male. Captain Houston of the Memphis Police Department stated that he was informed by Cox that the appellant had murdered Ms. Brewer. Thereafter, the officers verified Cox's statement through fingerprint examinations lifted from the bathroom sink near the location of the victim's body and from the victim's vehicle. He reiterated the fact that the officers promised to mention Cox's cooperation to the Attorney General's Office, however, they did not promise any specific deal in exchange for his testimony. Captain Houston further testified that no agreement existed as to whether Cox would have to testify.

Assistant District Attorney General Harris stated that he made no deal with Cox. During the appellant's trial, Harris asked Cox about his recent guilty plea to voluntary manslaughter.[9] Harris stated that he never talked to Cox until after the trial had begun and Cox had been released on the voluntary manslaughter conviction. Harris testified that he built the case on the testimony of the appellant's niece who testified that the appellant had admitted to killing the victim. Harris testified that he was not aware of the letter written by Officer Cook until the day of the post-conviction hearing. If he had known of the existence of the letter, Harris testified that he would have communicated that to defense counsel.

Assistant District Attorney General Peterson, the prosecutor in charge of the Willie Lee Cox case, testified that he made an offer to Cox on July 25, 1990, for fifteen years as a Range I standard offender for his second degree murder charge. The

---

[9]HARRIS: Now, just so the jury will have the context of your conversation, you were in trouble, weren't you?
COX: Yes, sir.
HARRIS: In fact, you've been in trouble several times, haven't you?
COX: Yes, sir.
HARRIS: And you've done time yourself for a homicide, have you not?
COX: Yes, sir.
HARRIS: One you were guilty of?
COX: Yes, sir.
HARRIS: All right. And it was voluntary manslaughter; is that correct?
COX: Yes, sir.

following memo, written by District Attorney General Pierotti on September 5, 1990, contained within the Cox file, was introduced through the testimony of Peterson:

> At the request of T.E. Cook and Bobby Garner, and due to [sic] huge amount of information defendant has given us, recommend probation. Defendant is worth more to us on the street than in jail. Dismiss driving charges. Any questions, see me.

Jones, defense counsel, did not recall receiving any specific information from the District Attorney's Office regarding a deal that was made with Cox. Watkins stated that the public defender's investigator, Mr. Carlisle, attempted to talk to Cox before the appellant's trial but to no avail. However, at trial, Watkins attempted to cross-examine Cox regarding a deal.[10]

On appeal, the State argues that there was no *Brady* violation for its failure to disclose information of a deal because "there was no deal." Contrary to this assertion, the record of the post-conviction proceeding clearly demonstrates that there was a deal for leniency with Cox. Although the supreme court on direct appeal was not privy to this information regarding a deal, these facts[11] cause this court considerable concern under

---

[10]On cross-examination:
WATKINS: And you talked to the police because you yourself had gotten in trouble?
COX: Yeah.
WATKINS: You were trying to make a deal?
COX: No, it wasn't really a deal.
WATKINS: It wasn't really a deal, but you thought it might be a deal?
COX: Yeah.
. . .
WATKINS: Voluntary manslaughter; is that correct, Mr. Cox?
COX: Yeah. Yes, ma'am.
WATKINS: How much jail time did you do?
COX: Six months.
HARRIS: Your Honor, I'm going to object as being irrelevant.
COURT: Sustained.
And, again on recross-examination:
WATKINS: At the time you made your statement, Mr. Cox, you were really charged with a murder in the second degree, weren't you?
HARRIS: Your Honor, I'm going to object to that.
COURT: Sustained. The objection is sustained.
COX: Yes.
COURT: The objection is sustained. The jury [sic] disregard the answer.

[11]The evidence produced at the post-conviction hearing established the following chronology of events:
07-03-89    The murder of Olive Brewer.
05-29-90    Cox indicted for second degree murder.
07-25-90    General Peterson offered Cox fifteen years for second degree murder which was rejected by Cox.

16

the requirements of *Giglio*.[12] However, we are precluded from holding otherwise in this

matter because the Tennessee Supreme Court has previously held this harmless error.

See Smith, 893 S.W.2d at 923-924.

> [I]f the voluntary manslaughter conviction did grow out of the 'trouble' Cox
> was in when he contacted the authorities, and this is not entirely clear
> from the record, the trial court should have allowed inquiry into Cox's
> treatment by the State on this conviction. *Any error, however, is*
> *harmless beyond a reasonable doubt.*(citations omitted). Cox's testimony
> made it clear that it was only after he was "in trouble" that he came
> forward to tell the authorities about Defendant's remarks. Although he
> denied any deal, he said that he had hoped there might have been one.
> The jury also heard he had served only six months on a guilty plea to
> voluntary manslaughter. The Defendant's confession to his niece and the
> presence of his fingerprints in the bedroom corroborated Cox's testimony.
> We find no reversible error.

Smith, 893 S.W.2d at 923-924 (emphasis added).


Issues that have been previously determined on direct appeal cannot support

a petition for post-conviction relief and are, therefore, excluded. See Tenn. Code Ann.

---

| 07-30-90 | Cox informs the Memphis Police Department that the appellant murdered Ms. Brewer. The appellant had not been charged. Officer Cook sends letter to District Attorney Stanton requesting leniency for Cox. |
| 08-07-90 | General Stanton offers three years. |
| 08-13-90 | Cox pled guilty to three years for voluntary manslaughter. |
| 09-05-90 | General Pierotti recommends suspended sentence and dismissal of driving charges for Cox. |
| 09-20-90 | Cox's three year sentence was suspended. |
| 03-07-91 | Petition to revoke Cox's probation for cocaine use was denied by the court. |
| 09-24-91 | The appellant's trial at which Cox testified. |
| 10-14-91 | Petition to revoke Cox's probation for theft of property was withdrawn by the State. |
| 03-30-92 | Petition to revoke Cox's probation was granted. |

[12]In Giglio, 405 U.S. at 152, 92 S.Ct. at 765, an Asst. U.S. Attorney promised a witness that he would not be prosecuted, while the subsequent attorney in charge of the case was not aware that a deal had been made by the former assistant. The Supreme Court held:

> [N]either DiPaola's [Asst. U.S. Attorney] authority nor his failure to inform his
> superiors or his associates is controlling. Moreover, whether the nondisclosure
> was a result of negligence or design, it is the responsibility of the prosecutor. The
> prosecutor's office is an entity and as such it is the spokesman for the
> Government. A promise made by one attorney must be attributed, for these
> purposes, to the Government. (Citations omitted). Id., 405 U.S. at 154, 92 S.Ct.
> at 766.

We note that the United States Supreme Court recognized that without this witness's testimony there would have been no indictment or enough evidence to present the case to the jury. Id., 405 U.S. at 154-155, 92 S.Ct. at 766. Therefore, that witness's credibility was critical to this case and any agreement for leniency from the prosecution would have been pertinent in deciding his credibility. Id. However, in the case before us, the Tennessee Supreme Court noted that, "[t]he Defendant's confession to his niece and the presence of his fingerprints in the bedroom corroborated Cox's testimony." Smith, 893 S.W.2d at 924.

§ 40-30-111, -112(a); Denton, 938 S.W.2d at 377. Thus, in accordance with our supreme court's previous ruling, this issue is without merit.

## V. Ineffective Assistance of Counsel

The appellant contends that he was denied effective assistance of counsel both at trial and on appeal due to counsel's (1) failure to object to the introduction of evidence and testimony of a used condom found at the crime scene; (2) failure to pursue hearings on pre-trial motions; (3) failure to properly investigate the possibility of other perpetrators; (4) failure to request money for expert services; (5) failure to investigate, litigate, or present proof regarding the appellant's competency to stand trial; (6) failure to investigate, litigate, or present proof regarding the appellant's sanity; (7) failure to investigate, litigate, or present proof regarding the appellant's mental retardation; (8) failure to investigate or present proof concerning mitigating evidence at sentencing; (9) failure to present facts on appeal to demonstrate that the Middlebrooks error was not harmless; and (10) failure to show that the appellant's death sentence is comparatively disproportionate.

Additionally, without citation to the record, explanation, or citation to any legal authority, the appellant lists twenty-four supplementary claims of ineffective assistance of counsel.[13] Also, the appellant contends (1) that appellate counsel was ineffective for

[13]Specifically, these claims include:
(1) Counsel failed to challenge Count One in the Indictment . . . because it omitted an element of the offense of felony murder;
(2) Counsel failed to make reasonable efforts to negotiate a settlement of the case;
(3) Counsel failed to challenge the prosecution's forum shopping;
(4) Counsel failed to investigate to determine whether the appellant had been denied his right to a jury pool representative of a fair cross-section of the community;
(5) Counsel failed to consult with the appellant at crucial stages of the proceedings;
(6) Counsel failed to adequately advise the appellant as to his right to testify;
(7) Counsel failed to develop a reasonable trial strategy or defense'

"not presenting sufficient facts to demonstrate that [the] <u>Middlebrooks</u> error" was not harmless error under <u>State v. Howell</u>, 868 S.W.2d 238 (Tenn. 1993); and (2) that appellate counsel was ineffective for its failure to demonstrate that his death sentence was comparatively disproportionate based upon "new facts" unavailable to the supreme court regarding his mental condition; unavailable exculpatory evidence; and the age, race, gender of the appellant.

The State submits that these additional allegations have been previously determined and/or waived. We agree. Initially, we note that the post-conviction court did find that the appellant had received effective assistance of counsel. As an ineffective counsel claim is but a single allegation, the court did rule on these issues, contrary to the appellant's assertion. <u>See</u> <u>Cone v. State</u>, 927 S.W.2d 579, 581-582 (Tenn. Crim. App. 1995), <u>perm. to appeal denied</u>, (Tenn. 1996), <u>cert. denied</u>, -- U.S. --, 117 S.Ct. 309 (1996). Moreover, the appellant's cursory enumeration of each allegation amounts to waiver, because these issues are not supported by argument nor

---

(8) Counsel failed to make a motion to recuse the trial judge;
(9) Counsel failed to adequately question prospective jurors regarding the sentencing phase of the trial;
(10) Counsel failed to develop an adequate record regarding the prosecutor's discriminatory use of peremptory challenges to remove African-American jurors in violation of <u>Batson v. Kentucky</u>;
(11) Counsel failed to adequately question prospective jurors regarding their possible misperceptions concerning parole eligibility and racial and other biases;
(12) Counsel failed to object to the exclusion of jurors based on religious objections;
(13) Counsel failed to file motions and or obtain rulings in advance of trial on pretrial motions;
(14) Counsel failed to adequately cross-examine witnesses;
(15) Counsel failed to object to the prosecutor's improper, misleading, and prejudicial statements concerning the law, the evidence and the appellant;
(16) Counsel failed to object to the prosecution's repeated use of leading questions during direct examination of prosecution witnesses;
(17) Counsel failed to object to certain jury instructions;
(18) Counsel failed to object to instruction that relieved the prosecution of its burden of proving all elements of the offense beyond a reasonable doubt;
(19) Counsel failed to object to erroneous and misleading reasonable doubt instructions;
(20) Counsel failed to investigate or present evidence in support of the issues raised in their motion for new trial;
(21) Counsel failed to discuss with the appellant the legal claims that could be raised pretrial, in the motion for new trial, and/or on appeal;
(22) Counsel failed to object to the sufficiency of the evidence presented in support of the aggravating circumstances;
(23) Counsel failed to object to the constitutionally of the aggravating circumstances;
(24) Counsel failed to object to the qualifiers "extreme" and "substantially" in the statutory mitigating circumstances instructed to the jury.

are there appropriate references to the record. <u>See</u> Tenn. R. App. P. 27(a)(7), -(g); Tenn. Ct. Crim. App. R. 10(b). Many of these claims were not argued at the post-conviction hearing nor was any proof related to these issues presented. When an appellant fails to articulate reasons to support a conclusory statement, the issue may be deemed waived. Tenn. R. App. P. 27(a)(7); <u>State v. McKay</u>, 680 S.W.2d 447, 454 (Tenn. 1984), <u>cert. denied</u>, 470 U.S. 1034, 105 S.Ct. 1412 (1985). <u>See also</u> Tenn. Ct. Crim. App. R. 10(b). Finally, several of the issues were raised and determined on direct appeal. The fact that these issues are now couched in terms of ineffective assistance of counsel is of no consequence. <u>See</u> <u>Overton v. State</u>, 874 S.W.2d 6, 12 (Tenn. 1994). Thus, our review of the appellant's Sixth Amendment claim does not encompass these numerous and often duplicitous allegations.

### A. Standard for Determining Ineffective Assistance of Counsel

When a claim of ineffective assistance of counsel is raised, the burden is upon the appellant to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984). Thus, the appellant must prove that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and the appellant must demonstrate that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> The appellant must establish both deficient performance and prejudice in order to prevail. <u>Id.</u> A reviewing court need not consider the two prongs of <u>Strickland</u> in any particular order. <u>Strickland v. Washington</u>, 466 U.S. at 697, 104 S.Ct. at 2069. Moreover, if the appellant fails to establish one prong, a reviewing court need not consider the other. <u>Id.</u>

With respect to deficient performance, the proper measure of attorney performance is reasonableness under prevailing professional norms. <u>Strickland v. Washington</u>, 466 U.S. at 688, 104 S.Ct. at 2065. In other words, the attorney's

performance must be within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975); Wright v. State, No. 01C01-9105-CR-00149 (Tenn. Crim. App. at Nashville), perm. to appeal denied, (Tenn.1994), cert. denied, 513 U.S. 1163, 115 S.Ct. 1129 (1995). This court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. at 2065. We should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Wright, No. 01C01-9105-CR-00149 (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn.1982)). Additionally, this court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland v. Washington, 466 U.S. at 689-690, 104 S.Ct. at 2065-2066. Moreover, we note that defendants are not entitled to perfect representation, only constitutionally adequate representation. Harries v. State, No. 833 (Tenn. Crim. App. at Knoxville, August 29, 1990), perm. to appeal denied, (Tenn.1991). However, we recognize that "our duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Burger v. Kemp, 483 U.S. 776, 785, 107 S.Ct. 3114, 3121 (1987).

To establish the prejudice prong of Strickland, the appellant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. That is, the evidence stemming from failing to prepare a sound defense or present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. State v. Brimmer, No. 03C01-9703-CC-00083 (Tenn. Crim. App. at Knoxville, Sept. 15, 1998) (citing Nealy

21

v. Cabana, 764 F.2d 1173, 1178-1179 (5th Cir. 1985); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986)). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." Brimmer, No. 03C01-9703-CC-00083 (citing State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim App. 1991); Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990), cert. denied, 498 U.S. 950, 111 S.Ct. 369 (1990)). Moreover, when challenging a death sentence, the appellant must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley v. State, 960 S.W.2d 572, 579-580 (Tenn. 1997), reh'g denied, (1998), cert. denied, No. 97-8880 (U.S. Tenn. Oct. 5, 1998) (citing Strickland v. Washington, 466 U.S. at 695, 104 S.Ct. at 2069).

### 1. Counsel's failure to object to the admission of testimony regarding the used condom.

At the appellant's trial, the State introduced a used condom found in a bedroom closet at the crime scene. No objection was made to the introduction of this evidence. The appellant contends that his attorneys were ineffective for failing to object to the introduction of testimony regarding the condom. Specifically, he argues that the condom was irrelevant because the appellant was not charged with rape or any sexual offense and, given its prejudicial effect, should not have been admitted. He further asserts that no evidence of sexual activity existed other than the condom and that a condom alone is not evidence of rape.

In its findings of fact and conclusions of law, the post-conviction court determined:

> The petitioner alleges that the trial counsel's representation was ineffective because they did not object to irrelevant evidence that was presented during the trial. The evidence complained about was a used condom found at the scene of the crime. The petitioner maintains that the condom was not identified through physical or scientific proof to the defendant. This Court is of the opinion that the evidence complained of was clearly relevant considering the entire record of the case. The condition and position of the victim's clothing, the victim first being tied up and placed on the bed and her subsequent removal to the tub were

22

certainly indications separate and apart from the condom that would indicate the victim had been raped prior to her death. Defense counsel cannot be held to be ineffective for not objecting to evidence that is properly admissible. The Court finds this allegation to be without merit.

The appellant contends that the post-conviction court's finding fails to address the question of why evidence of an uncharged rape is relevant in a prosecution for felony murder where the underlying crime is robbery. Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, such evidence may be admissible for other purposes. For example, proof of bad acts occurring before and after the offense at issue are admissible to provide the trier of fact with "the full story." See State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995) (citing N. Cohen, *Tennessee Law of Evidence*, § 404.11 (2d ed. 1990). E.g., State v. Payne, 791 S.W.2d 10, 16 (Tenn. 1990), *aff'd by*, Payne v. United States, 501 U.S. 808, 111 S.Ct. 2597 (1991)); see also State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996). Moreover, considering that the jury learned of the State's failure to test the contents of the condom and, therefore, could only infer that the appellant perpetrated a rape against the victim, we conclude that the probative value of such evidence outweighed the danger of unfair prejudice, as the condom was not specifically identified as belonging to the appellant. See Tenn. R. Evid. 401, 402, 403. Counsel cannot be found ineffective for failure to object to evidence which is obviously admissible. See Hellard, 629 S.W.2d at 11. This issue is without merit.

### 2. Counsel's failure to pursue hearings on pretrial motions.

The appellant contends that his attorneys "utterly failed to adequately prepare this death penalty case for trial." As evidence of counsel's total inadequacy, the appellant asserts that counsel "did not even docket for hearing a number of non-case-specific, generic motions that had been previously filed." Thus, the appellant argues

that he was deprived of the opportunity to obtain complete discovery, expand the scope of voir dire for the defense, narrow the State's proof, expand the defense proof, identify the evidence to be presented at trial, and to generally develop his case and explore settlement possibilities.

Approximately thirty "boilerplate" pre-trial motions, relative to all capital cases, were filed in this case. The trial court refused to entertain these motions because they had not been set for hearing prior to trial.[14] At the post-conviction hearing, Isaiah Gant, an attorney who testified as an expert in the defense of capital cases, explained that pretrial motion practice is crucial in death penalty cases in that such practice defines the parameters of both the prosecution and defense cases. As such, Gant concluded that trial counsel's failure to have these motions heard affected the entire case. Robert Jones, lead trial counsel for the appellant, explained that the motions were not docketed for trial because "we felt that the death penalty would not apply in this case." Additionally, Assistant District Attorney Harris, who prosecuted the appellant's case, recalled that there were no issues requiring a pre-trial hearing and that the motions filed "go to the constitutionality of the death penalty" and "are filed in every death penalty case." He added that these motions are normally filed in order for "the defense [to] preserve the record. They are usually submitted without argument."

The post-conviction court found that it was proper to file these "general motions to protect the record." However, the fact that the motions were filed is not the basis of the claim of ineffectiveness. At trial, lead counsel could offer no explanation to the trial court as to why these motions had not been set for argument. This, in and of itself,

---

[14]Regarding trial counsel's failure to have pre-trial motions set for hearing, the following colloquy occurred at the trial level:
COURT: Why in the world haven't you asked for a hearing on these motions?
JONES: Your Honor, we probably should have.
COURT: You didn't answer my question. Why haven't you?
JONES: I don't have a reason.
COURT: That's the question.
JONES: I don't have a reason, your Honor.
COURT: I think you've waived your motions. I think you've waived your motions waiting to the day of trial. I'm not going to hear motions on the day of trial, period. I rule that you have waived them.

amounts to deficient performance. However, as the appellant has failed to show how any of these motions would have impacted his trial and that he was prejudiced thereby, we conclude that he has not met his burden of establishing his claims by a preponderance of the evidence.

### 3. Counsel's failure to properly investigate other possible perpetrators.

The appellant contends that his trial counsel was ineffective for failure (1) to investigate two additional suspects, Anthony Lewis Ross and Taurus Dwayne Gardner; and (2) to investigate and question the officers regarding the statement of Alice Cooper. Appellant's post-conviction counsel failed to present any supporting evidence of these contentions; and we will not speculate as to the alleged suspect's involvement nor to the testimony of Ms. Cooper, as previously stated. Because the appellant has failed to demonstrate any prejudice, this issue is without merit.

### 4. Counsel's failure to request funds for expert services.

The appellant contends that his trial counsel was ineffective for failing to secure the funds necessary to provide an effective defense. Specifically, he points to counsel's failure to request funds to conduct a mental status evaluation, to retain a serologist or DNA expert to test the used condom found at the crime scene, to retain a forensic expert to determine whether the hair combings from the victim included or excluded the appellant, and to retain a fingerprint expert to conduct an independent evaluation of the incriminating fingerprint evidence.

There is no dispute that, despite the appellant's continued assertions of innocence, trial counsel failed to request any funds for any of the above enumerated expert services.

### a. Failure to request DNA/Serologist expert to examine condom and hair

**samples.**

At the post-conviction hearing, Robert Jones testified that the decision not to have the hair combings from the victim's body and the contents of the condom tested were tactical decisions, as the defense team believed that there "was a good chance that it would have been our client. We felt that we would be in a much better position to show that the State had not fully investigated the case, rather than taking a chance on proving it was Mr. Smith." In effect, the State's failure to submit these same items for forensic analysis permitted the appellant to argue that the State had failed to establish his connection to this evidence. We cannot now say in hindsight that this was an unsound strategical decision. Hellard, 629 S.W.2d at 9.

Moreover, before he may succeed on such a claim of ineffectiveness, the appellant must show that, but for, counsel's failure to request an expert, the jury would have had a reasonable doubt concerning his guilt. The appellant has not met this burden. In order to obtain expert services, a defendant must show a particularized need for such services. See State v. Shepherd, 902 S.W.2d 895, 904 (Tenn. 1995). "The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance." State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992), cert. denied, 510 U.S. 1064, 114 S.Ct. 740 (1994). He has not identified an expert witness available to testify on his behalf or the type of testimony such a witness would have provided beyond that elicited at trial. See Black, 794 S.W.2d at 757. This issue is without merit.

**b. Failure to request funds for expert mental health evaluation.**

As explanation for the absence of a request for funds for a mental health expert, Jones testified that there were adequate resources from the Public Defender's Office to cover the fees of the mental retardation examination, thus, there was no need

26

to request additional funds from the court. Although Jones' explanation that adequate funds were available from the Shelby County Public Defender's Office suffices to negate the need to request such funding from the court, as this issue affects subsequent allegations of ineffectiveness regarding investigation and presentation of the case, we refrain, at this juncture, from determining whether the omission of such a request prejudiced the appellant's defense.

### c. Failure to request expert services for fingerprint analysis.

No testimony was presented to explain the failure to request a fingerprint expert. There is no doubt that the fingerprint evidence was a crucial piece in the State's case, establishing the identity of the appellant.[15] Thus, absent any explanation in the record, we presume a threshold finding of deficient performance. Notwithstanding, the appellant has not demonstrated how he was harmed by counsel's failure to request the services of independent experts. See Black, 794 S.W.2d at 757. The qualifications of the State's experts were not challenged and there is no allegation of bias. Additionally, at trial, counsel cross-examined the expert who examined the fingerprints. The appellant has not identified an expert witness available to testify on his behalf nor has he shown what additional tests his experts would perform or what new testimony they would present. See Black, 794 S.W.2d at 757. The appellant has failed to show how such expert testimony would have altered the outcome of his trial. Moreover, the mere fact that the State relies upon expert evidence does not mean that an indigent accused is entitled to an expert absent a showing that the failure to provide expert services amounts to a denial of due process. See State v. Phillips, 728 S.W.2d 24, 25 (Tenn. Crim. App. 1986). Accordingly, the appellant has failed to meet his burden of

---

[15]In addition, the appellant contends that defense counsel failed to investigate the report from the fingerprint examiner. The report of Officer Sims indicated that prints of two separate adult individuals were found on the scene as well as one print of a juvenile. One of the adult prints came from inside the victim's home and that print belonged to the appellant. The other adult prints were located on the victim's vehicle, one belonging to the appellant and the other to a police officer who had worked the crime scene. The juvenile hand print remained unidentified. Counsel's failure to investigate the unidentified fingerprint is encompassed within his failure to request a fingerprint expert.

establishing that counsel's failure to request a fingerprint expert prejudiced the outcome of his trial.

**5. Counsel's failure to investigate, litigate, and present proof on the appellant's sanity, his competency to stand trial, and his mental retardation and counsel's failure to present mitigating evidence during the sentencing phase.**

The appellant argues that his mental condition was critical at both the guilt and the sentencing phases of his trial and defense counsel's failure to explore, investigate, litigate, and present available proof of his mental condition constituted ineffective assistance of counsel.

At the post-conviction hearing, Robert Jones testified that, upon assignment to the appellant's case, the entire defense team, which included two attorneys and two investigators, met with the appellant. Jones stated that the appellant gave them names of his family members and some general information. During this interview, the appellant denied any involvement in the crime. He explained to his attorneys that he may have been at work at the time of the crime, but counsel was unable to verify this alleged alibi or develop a plausible alibi defense. Again, the appellant presented no proof at the guilt phase of his trial.

Jones related that he ordered investigations into the facts of the case and the appellant's background. The defense team interviewed at least thirteen witnesses prior to trial, including members of the appellant's family, however, none provided any helpful information regarding the appellant or the case. Jones also testified that he had requested competency and sanity evaluations of the appellant. Despite his assertions, he was unable to provide any record of this request, nor any record that the appellant was ever evaluated to determine whether the defense of insanity could be supported or whether the appellant was competent to stand trial. Jones stated that Dr. Hutson was requested to administer an IQ test and the appellant achieved an IQ test result of 54. The results of this test and the appellant's school records were the basis of a

motion to determine whether the appellant was mentally retarded and, thus, statutorily ineligible to receive the death penalty.[16] This motion was filed on the first scheduled day of trial and was denied by the trial court because the appellant failed to prove "deficits in his adaptive behavior," notwithstanding the fact that this proof was readily obtained and established at the post-conviction hearing.[17] Jones stated that at the motion hearing, the defense team only had possession of the appellant's school records; they had nothing of substance from any of the previous correctional institutions or related parole reports.[18] He admitted that he could not recall what proof was introduced at this hearing.[19]

Jones stated that he had sent a release to the Department of Correction for the appellant's records and received eleven pages regarding the appellant's incarceration at Fort Pillow. His files revealed a note that the defense team had received records from Taft Youth Center, although the actual record was not in the file. He stated that he had no records from Dismas House or the Board of Paroles. He did not have any records from the Shelby County Juvenile Court or the Covington Mental Health Center. His files contained no psychological evaluation other than information regarding the IQ test performed by Dr. Hutson. Jones testified that he was unaware of prior mental evaluations conducted during the appellant's prior periods of incarceration by at least

---

[16]The death penalty may not be imposed where the defendant is mentally retarded. See Tenn. Code Ann. § 39-13-203(b). To prove that he is ineligible for a death sentence, a defendant has the burden of showing, by a preponderance of the evidence, that (1) he has a functional I.Q. of seventy (70) or below; (2) he exhibits deficits in adaptive behavior; and (3) that the mental retardation manifested during the defendant's developmental period, or by age eighteen (18). See Tenn. Code Ann. § 39-13-203(a).

On direct appeal, our supreme court determined that the appellant failed to prove "deficits in his adaptive behavior." Smith, 893 S.W.2d at 918.

[17] Indeed, the supreme court noted in its opinion, "[i]t is regrettable that Dr. Hutson . . . did not discuss the adaptive deficit prong. . . . The record is inadequate to support a finding that the defendant suffers from deficits in his adaptive behavior." Smith, 893 S.W.2d at 918.

[18]The records from the Department of Correction in the possession of defense counsel transcribed an evaluation of the appellant when he was seventeen years old finding: "We believe subject to have below average intelligence. Prognosis for prison and civil adjustment guarded."

[19]The State concedes that defense counsel was ineffective for failing to present adequate proof at the hearing held to determine whether, as a matter of law, the appellant could receive a sentence of death.

eight separate psychologists. Jones testified that the only witness presented during the sentencing phase by the defense was Dr. Hutson. Jones stated that they chose not to introduce friends or family members because they were afraid these witnesses would relate that the appellant was more competent than they believed he was, because the appellant's family members were hostile toward the appellant due to his rape of his sister's child, and because they were afraid of the State's cross-examination regarding violent episodes in the appellant's life.

Carolyn Watkins, second chair counsel to Robert Jones, testified that this was her first capital case. She stated that Dr. John Hutson was retained by their office because the defense team "felt that the defendant had some type of psychological or mental problem." She explained that Dr. Hutson was instructed to interview the appellant, assess the appellant as to the nature of any problem, and "let us know what he thinks," because after their initial interview the defense team thought the appellant was slow. Despite her assertions that the defense team had requested that Dr. Hutson perform a competency evaluation, her records could not verify such a request.

Dr. John Hutson, the psychologist retained by the Public Defender's Office, testified that he was only instructed to administer a Stanford-Binet I.Q. test to the appellant. He testified that the Stanford-Binet test usually scored lower than the more widely used Wechsler test. He stated that based upon the Stanford-Binet test, the appellant achieved an IQ of 54, which probably meant that the appellant functioned in the low to mid 60's. He opined that he believed the appellant to be mentally retarded as defined by statute. He also testified that the appellant's mental retardation manifested itself during the appellant's developmental period before age eighteen. He further stated that the defense team did not ask him to perform a competency evaluation nor was he asked to explore a possible insanity defense. In fact, Dr. Hutson testified that he never reviewed any records regarding the appellant until the day of the post-conviction hearing.

30

Isaiah Gant, testifying on behalf of the appellant, stated that, after reviewing counsel's files and the record in this case, in his opinion, the appellant had a mental state defense at the guilt phase of the trial, although his counsel did not pursue this. Additionally, he opined that, based upon the reports he reviewed, that the proof offered in support of the mental retardation issue was inadequate.

Gloria Shettles, a private investigator with Inquisitor Inc., was hired by post-conviction counsel to inquire into the appellant's background. Her inquiry revealed that the appellant's father died from an alcohol related illness when the appellant was sixteen years old. His mother worked two full-time jobs to support the appellant and his four siblings and, apparently, drank heavily when she was at home. The appellant often missed school and had to repeat the second, third, and seventh grades. The appellant never completed the seventh grade. Although he had studied and taken preparatory courses while in prison, the appellant was never able to pass a GED examination.

Shettles also interviewed the appellant on several occasions, at times when he was taking anti-psychotic medication and other times when he was not taking the medication at all. When he had not been taking his medication, he suffered from headaches and appeared agitated. After the appellant had resumed taking his medication for a period of two to three days, Shettles observed a noticeable difference in his demeanor, *i.e.*, the appellant was much more relaxed and less irritated. She stated that the parole board would have had access to all of the appellant's records while reviewing parole considerations. She added that, although many of the appellant's relevant parole field records had now been destroyed, these records would have been available at the time of his trial. Shettles concluded that the appellant's life had been one constant sequence of violent acts until he began receiving medication.

Mattie Halley was the appellant's seventh grade teacher at Porter Junior High

School. She explained that the appellant was in a federally funded program designed to help students who had an IQ less than 80 and who performed three to four grade levels below the norm. She recalled

> having worked with [the appellant] and witnessed quite a bit of frustration on his part. Especially when I gave him a simple task to perform. He would attempt to do whatever I put before him to do, but he just couldn't do it.

Because of his problems, Halley stated that she took a particular interest in the appellant and gave him individualized attention. She verified, through school records, that the appellant had an IQ of 72 in 1957, and an IQ of 67 in 1960. She also testified that the highest grade reading equivalency the appellant ever reached was a reading level of fourth grade, four months.

Mary McGlothin testified that she met the appellant, soon after his release from incarceration in 1987, while they were both employed at S & S Cafeteria. Through this employment, the two became friends and the appellant lived in her home for about four months. She explained that, at work, the appellant worked very efficiently but that he had problems taking orders. He would become frustrated, ill- tempered, and hostile. After being employed for about six months, the appellant was asked to leave because he was caught stealing a battery at a nearby K-Mart store. Ms. McGlothin testified that, personally, the appellant desired a boyfriend-girlfriend relationship with her, which she rejected. She observed that "he did have mental problems." On several occasions, the appellant claimed to hear voices from God telling him to kill people. While he resided with her and her children, "[i]t was like having another child. He demanded a lot of attention and was desperate for somebody to care about him." He was very dominating and was jealous of Ms. McGlothin's other friends. She further testified that the appellant was unable to successfully travel by bus, thus, he resorted to walking or riding his bicycle wherever he went. She also stated that he was very moody. On one occasion, the appellant came in with a sawed-off shotgun, to which Ms. McGlothin objected. The incident resulted in Ms. McGlothin calling "911" and the police having to restrain the appellant. As a result of this incident, the appellant spent four months

in the Shelby County Jail.

Dr. William Bernet, Medical Director of the Psychiatric Hospital at Vanderbilt, testified that he was retained by post-conviction counsel to interview and evaluate the appellant. He stated that he interviewed the appellant for two hours and reviewed the medical, legal, administrative, and educational records of the appellant. As a result of his evaluation, Dr. Bernet concluded that the appellant "has multiple bio-psycho-social handicaps, . . .[encompassing] a number of different areas; including his intelligence." Dr. Bernet opined that the appellant has a below normal intelligence and that the appellant has a serious psychiatric illness, specifically an illness that is psychotic. He stated that the appellant "may have some brain damage. And that [the appellant] has been in institutions so long, I think he has been affected by that."

Dr. Bernet further explained that the appellant's low intelligence is manifested by his school performance, his poor academic performance, his inability to pass a GED examination, and his inability to maintain a job. He opined that the appellant's psychiatric condition fits most closely to paranoid schizophrenia, manifested by many incidents of hallucinations, auditory hallucinations, paranoia, and irritability in dealing with other people. Additionally, Dr. Bernet observed that the appellant had previously been treated, while in prison, for schizophrenia with antipsychotic medication. When asked whether the appellant was competent at the time of his trial in October 1991, Dr. Bernet responded that "the fact that he wasn't on medication at the time, that when he's not on medication . . . he is hallucinating and psychotic and disorganized . . . it's more likely than not that he was not competent at the time of the trial." (Emphasis added). He continued to state that "if you are both psychotic and . . . retarded then it's even more of a handicap than having either one of them alone." He opined that it is

> very probable that [the appellant] has had this condition for a long time and that he had these conditions at the time of the alleged offense. And that these conditions may have prevented him from understanding the wrongfulness of his actions or conforming his actions to the requirements of the law.

33

(Emphasis added). In conclusion, Dr. Bernet stated that the appellant's

> serious mental disorder would have prevented him from forming an intent to commit a particular act. If you combine a man who has a psychotic illness, who has low intelligence, who could well have been intoxicated at the time, I think all these things could have prevented him from forming an intent.

(Emphasis added).

Dr. Geraldine Bishop, a clinical psychologist also retained by post-conviction counsel, assessed the adaptive behavior of the appellant. She administered the test twice, once based upon the appellant's condition while in a structured environment on death row and another while in the community without receiving any medication immediately before the time of the murder. Using an adaptive behavior scale published for the American Association of Mental Retardation and by interviewing the appellant, his prison case manager, and Mary McGlothin, Dr. Bishop was able to obtain a continuum of behavior that allowed her to project what the appellant's adaptive behavior was like during his developmental period. She opined that the appellant had current, as well as a history of, retarded adaptive behavior, meaning that the appellant was unable to adapt to the surrounding circumstances. She also concluded that this retarded adaptive behavior developed well before he was eighteen years old.

Gail Barbee, with the Tennessee Board of Parole, introduced several documents. These documents included "notices of board action" regarding the appellant's eligibility for parole. Specifically, on June 4, 1986, parole was recommended conditioned upon the appellant being sent to Dismas House. This report also noted that the appellant "has lost contact with the outside world and will need support on the outside." Subsequent notices on September 12, 1986; May 15, 1987; and June 25, 1987, stated that parole would have to be conditioned on release to Dismas House.

At the post-conviction hearing, the State called no witnesses to contradict the

expert opinions of Drs. Hutson, Bernet, and Bishop.

### c. Analysis

As the issues involving the defendant's mental condition are so intertwined that they cannot be neatly divided into separate areas, we begin our review by consolidating the appellant's allegations involving competency, sanity, and mental retardation. See, e.g., Starr v. Lockhart, 23 F.3d 1280, 1290 n.7 (8th Cir. 1994), reh'g denied, (1994), cert. denied, 513 U.S. 995, 115 S.Ct. 499 (1994). Next, mindful that counsel's duty to investigate all reasonable lines of defense is most strictly observed in capital cases, we must determine whether trial counsel knew or, through reasonable investigation, should have known of the appellant's pre-existing mental history. See Coleman v. Brown, 802 F.2d 1227, 1233-1234 (10th Cir. 1986), cert. denied, 482 U.S. 909, 107 S.Ct. 2491 (1987). For counsel to be ineffective in failing to investigate an alleged mental condition, the appellant must show facts indicating a possible mental condition. Sometimes it will be evident from the evidence concerning the circumstances of the crime, from conversation with the defendant, or from other sources of information not requiring fresh investigation, that the defendant has some mental or other condition that will require further investigation, and then the failure to investigate will be ineffective assistance. See Antwine v. Delo, 54 F.3d 1357, 1365-1368 (8th Cir. 1995), cert. denied, 516 U.S. 1067, 116 S.Ct. 753 (1996); Brewer v. Aiken, 935 F.2d 850, 857-858 (7th Cir. 1991).

The evidence presented at the post-conviction hearing revealed that defense counsel possessed evidence regarding the appellant's mental status which they essentially ignored. This is not a situation where trial counsel was completely unaware of their client's mental problems prior to trial. Indeed, defense counsel's file included, in addition to the results of Dr. Hutson's IQ test results establishing an IQ of 54, (1)

35

notations that defense counsel knew or had reason to know that the appellant had been prescribed antipsychotic medication and had been mentally evaluated while in prison, (2) notes indicating that the appellant "may need examination Review," and (3) a memo from Parole Supervisor Bernard Bennett which reflects "can order mental evaluation."

Despite this information, defense counsel failed to pursue an investigation into the appellant's mental history. If they had conducted <u>any type of reasonable</u> effort to seek out such information, they would have discovered that the appellant has spent most of his life institutionalized.[20] In addition to his behavioral records, his Department of Correction record documents a continuous history of mental evaluations, counseling, and concerns.[21]

---

[20] Specifically, the following time line exemplifies the severity of the appellant's institutionalization:

| | |
|---|---|
| **1964-1965** | State Vocational Training School for Colored Boys |
| **1966-1968** | Tennessee Department of Correction |
| **1970-1987** | Tennessee Department of Correction |

**1976**: administered antipsychotic medication
**1979**: referred to Covington Mental Health Center for evaluation: suffered mental confusion, impaired memory, paranoid ideation, auditory hallucinations, depressive symptoms, obsessive compulsive behavior. Treated with antipsychotic and antidepressant medication. Parole Board advised that upon release, appellant should continue medication.
**1980**: psychiatric evaluation completed, results concluded that appellant is completely institutionalized and dependent upon controlled environment for survival.

**1987**: Defendant paroled and does not continue medication.

| | |
|---|---|
| **1988** | Shelby County Jail. No mental treatment, defendant experiences auditory hallucinations. |
| **1990** | Shelby County Jail. No medication. |

[21]

| Date | Age | Report |
|---|---|---|
| 5-19-82 | 34 | Recommendation of psychiatric interviews through TCMHC. |
| 10-13-81 | 33 | "On 10-2-81 subject was deferred clemency consideration until 6-83. States he is still receiving psychiatric counseling." |

36

The information revealed at the post-conviction hearing raises doubt as to the appellant's competency to stand trial, his sanity at the time of the commission of the offense, and his level of mental retardation. We cannot arrive at any conclusion other than finding that trial counsel's abandonment of furthering its investigation into the appellant's mental condition, after only a cursory investigation regarding the appellant's

| | | |
|---|---|---|
| 3-31-81 | 33 | "Subject is currently receiving [psychological] interviews and/ or medication. . . " |
| 10-23-80 | 32 | "This man brings to the interview a long and varied history of charges, problem behavior while in prison, and a continuing need for mental health interventions. He is presently on maintenance psychotropic medication, although he has received none since returning to the Main Prison and reports no ill effects. Earlier testing indicates an intellectual ability below average but within the normal range. . . .While there is no reason to suspect at this time the presence of any primary mood or thinking disorder, he does appear to be a man completely institutionalized and dependant on a controlled and supervised environment for survival." Dr. Morgan's Report. |
| 10-2-80 | 32 | "Psychological interviews at discretion of inst. counselor." "Mental Health for Medication" "This man was 17 years old when he was sentenced in 1966 for Burg[lary]. . . . . His life has been a nightmare since then. It would take pages to get a full picture of the past. . . . In December 1979 [Philip Rhoads] began to notice general mental confusion. . . . In late January plans were made to have him seen by Covington Mental Health. Finally he was permitted to go April 1980 to see Dr. Esther Roberts. With her help later he was given a neurological evaluation by Dr. Georgia Montouris . . . . Her report said he had no brain damage. Another referral was made to Dr. Roberts at Covington Mental Health in July 1980 and was placed on medication. He continues to improve at this time." |
| 9-30-80 | 32 | Recommendation of psychological interviews. |
| 7-16-80 | 32 | "Appears more in control today but stating that he still is in need of assistance for control of his impulsive desire to hurt himself or others especially if they appear ignorant in behavior. Obsessive compulsive thinking evidence as effort to reduce anxiety to more manageable encounters. There still seems to be evidence of organicity and failure to comprehend various facets." Dr. Roberts, Covington Mental Health. |
| 4-9-80 | 32 | "He appeared through the interview session as being quite preoccupied in thought and manner and frequently exhibiting a smiling inappropriate affective response to questions. Depressive features were very noticeable with psycho-motor retardation and conscious focused attention on suicidal ideation that centered on the deaths of his parents. . . . . Description of prodromal symptoms accompanying the onset of one sided headaches bright halo type lights creating effects and overwhelming needs to isolate himself from others in his surrounding because of irritability. Also exhibits paranoid ideation that other inmates are setting him up to get him in trouble. Circumstantial and loose ideation also present. He furthermore rationalizes his paranoid thinking as justification for possible homicidal intents against guards and fellow prisoners. . . . The overall impressions of Mr. Smith is that he requires further neuropsychological evaluation for evidence of organic impairment. . . . This injury is probably accentuating a personality defect or pathological psychosis manifested by poor impulse and judgment and paranoid thinking." Dr. Roberts. |
| 7-25-79 | 31 | Recommendation of psychiatric treatment. |
| 12-2-68 | 20 | "This subject shows a willingness to work but just can't seem to get a grasp on things." |

IQ, was not reasonable under the circumstances. Counsel's duty to investigate derives from counsel's basic function which is "to make the adversarial testing process work in the particular case." Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S.Ct. 2574, 2066 (1986). Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Kimmelman v. Morrison, 477 U.S. at 384, 106 S.Ct. at 2066.

A tactical choice not to pursue one course or another should not be confused with the duty to investigate; trial counsel's decision not to further investigate into the appellant's mental health status and background was not strategic. Although trial counsel is afforded tremendous deference over matters of trial strategy, the decision to select a trial strategy must be reasonably supported and within the wide range of professionally competent assistance. Strickland v. Washington, 466 U.S. at 690, 104 S.Ct. at 2066. Viewing the performance of counsel solely from the perspective of strategic competence, the reviewing court must find that defense counsel made a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's case to the jury. An attorney is not ineffective merely because he fails to follow every evidentiary lead. However, a strategic decision is not reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.

In the present case, the State's evidence consisted of fingerprint evidence taken at the crime scene and the appellant's confessions to his niece and Willie Cox. Suffice it to say, the case against the appellant was strong. Faced with these facts, trial counsel failed to take advantage of information relative to the appellant's mental condition; hence, failing to consider or pursue a defense of insanity or the issue of

38

whether the appellant was even competent to stand trial. Rather, defense counsel proceeded to trial apparently hoping to cast, through cross-examination, reasonable doubt upon the State's proof; in essence, they presented "no defense." The question is not whether an alternative defense would have been successful, but, rather, whether counsel ignored the only viable trial strategy under the facts. The evidence available to the defense team not only triggered a duty to investigate further but also a duty to seek a competency hearing to determine whether the appellant was mentally able to consult with the defense team and aid in his defense with a reasonable degree of rational understanding. Additionally, if defense counsel had presented such evidence relating to the appellant's mental condition, the burden of proving insanity by a preponderance of the evidence would have shifted to the State to prove his sanity at the time of the offense beyond a reasonable doubt. Counsel's failures in this regard constitute deficient performance. See Antwine v. Delo, 54 F.3d at 1367-68 (holding counsel ineffective in failing to investigate fully before rejecting strategies based on client's mental condition); Kenley v. Armontrout, 937 F.2d 1298, 1304-1308 (8th Cir). (same), cert. denied, 502 U.S. 964, 112 S.Ct. 431 (1991).

Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories. See Hill v. Lockhart, 28 F.3d 832 (8th Cir. 1994), reh'g denied, (1995), cert. denied, 513 U.S. 1102, 115 S.Ct. 778 (1995). Clearly, counsel's performance in the present case was not reasonable and fell below the range of sound professional assistance. To do little or no investigation at all on an issue that not only implicates the accused's only viable defense, but also his present competency, is not a tactical

decision.[22] It is only in very rare circumstances where a decision not to investigate a

---

[22]See, e.g., Seidel v. Merkle, 146 F.3d 750, 755 (9th Cir. 1998) (ineffective performance when trial counsel failed to conduct any investigation at all into his client's psychiatric history and therefore neglected to pursue a potentially successful defense), petition for cert. filed, No. 98-433 (U.S. Sept. 10, 1998); Deutscher v. Whitley, 884 F.2d 1152, 1159-1160 (9th Cir. 1989), vacated on

client's mental condition would be reasonable after counsel has notice of the client's history of mental problems. Where counsel (1) makes some exploration of the mental history of the appellant but <u>fails to take an obvious and easily available step</u> which would have made such a defense viable, (2) <u>does not produce reasonable tactical reasons</u> for not pursuing further investigation, and (3) <u>raises no other plausible defense</u>, courts may find ineffective assistance of counsel. <u>See</u> <u>Walker v. Mitchell</u>, 587 F. Supp. 1432 (E.D. Va. 1984) (emphasis added); <u>see also</u> <u>Loe v. United States</u>, 545 F. Supp. 662 (E.D. Va. 1982), *aff'd mem.*, 701 F.2d 149 (4th Cir. 1983).

Given the severity of the charges and potential penalty facing the appellant, we believe that it was the duty of the appellant's attorneys to collect as much information as possible about the appellant's mental history. The failure to obtain the records verifying the appellant's treatment with antipsychotic medication was not a tactical decision but, rather, the result of counsel's inadequate preparation resulting in their failure to discover the evidence. <u>See</u> <u>Laws v. Armontrout</u>, 863 F.2d 1377, 1385 (8th Cir. 1988) (*en banc*), <u>cert. denied</u>, 490 U.S. 1040, 109 S.Ct. 1944 (1989). We further find it impossible to fathom that the appellant was not prejudiced by trial counsel's failure to explore the appellant's mental history for possible defenses, proof, and mitigating evidence. The psychiatric evidence, if properly investigated and presented could have totally changed the evidentiary picture in the present case. "When defense counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing, there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.'" <u>Brimmer</u>, No. 03C01-9703-CC-00083 (citing <u>United States v. Cronic</u>, 466 U.S. 648, 659, 104 S.Ct. 2039, 2045 (1984)). Thus, we find counsel's failure to investigate the appellant's mental condition both deficient and

<u>other grounds</u>, 500 U.S. 901, 111 S.Ct. 1678 (1991) (Counsel made no tactical decision not to investigate the defendant's possible mental impairment. He simply failed to do so.); <u>Evans v. Lewis</u>, 855 F.2d 631, 637 (9th Cir. 1988) (counsel's failure to pursue the possibility of establishing the defendant's mental instability constituted deficient performance); <u>see also</u> <u>Bloom v. Calderon</u>, 132 F.3d 1267, 1277 (9th Cir. 1997), <u>cert. denied</u>, -- U.S. --, 118 S.Ct. 1856 (1998); <u>Hendricks v. Calderon</u>, 70 F.3d 1032-1044 (9th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1111, 116 S.Ct. 1335 (1996); <u>Maddox v. Lord</u>, 818 F.2d 1058, 1061-1062 (2d Cir. 1987).

prejudicial requiring a new trial.

### b. Mitigating Evidence at Sentencing Hearing

Although our supreme court has observed that there is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial, State v. Melson, 772 S.W.2d 417, 421 (Tenn. Crim. App. 1989), cert. denied, 493 U.S. 874, 110 S.Ct. 211 (1989), we remain cognizant of the fact that the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Thus, although there is no requirement that defense counsel present mitigating evidence in the sentencing phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and the sentencing phases, Goad v. State, 938 S.W.2d 363, 369-370 (Tenn. 1996) (citations omitted), and, before selecting a strategy at sentencing, counsel must conduct a reasonable investigation into the appellant's background for mitigation evidence to use at sentencing. See Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir. 1995), reh'g denied, (1995) (*en banc*), cert. denied, 516 U.S. 946, 116 S.Ct. 385 (1995).

In determining whether or not trial counsel was ineffective for failing to present mitigating evidence, our supreme court has outlined several factors to consider in making such an evaluation. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992); State v. Adkins, 911 S.W.2d 334 (Tenn. Crim. App. 1994)). Second, the court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992), cert. denied, 515 U.S. 1165, 115 S.Ct. 2624 (1995); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499

U.S. 913, 111 S.Ct. 1123 (1991); Melson, 722 S.W.2d at 421. Third, the court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. Id. (citing Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991), cert. denied, 502 U.S. 1112, 112 S.Ct. 1219 (1992); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), cert. denied, 485 U.S. 1014, 108 S.Ct. 1487 (1988)).

By failing to investigate the appellant's mental history, defense counsel effectively precluded the jury from considering the combination of his troubled and dysfunctional home life, evidence of his mental retardation, evidence of deficits in his adaptive behavior, evidence of his history of "mental confusion, impaired memory, paranoid ideation, [and] auditory hallucinations," his prolonged period of institutionalization, and his current and prior treatment with antipsychotic and antidepressant medication. Even if the jury had rejected the defense of insanity, evidence of the appellant's failure to take antipsychotic medication would have been critical in attempting to show mitigating circumstances. The evidence with respect to the appellant's history of successful treatment with anti-psychotic drugs and of his regression when he discontinued those drugs indicated a likelihood that he was suffering from long-standing and extensive mental problems. Yet, the jury had no opportunity to consider that evidence.

Given the significant evidence of the appellant's history of mental conditions and disorders, we can hardly imagine that the appellant was not prejudiced by his lawyers default. See generally Stephens v. Kemp, 846 F.2d at 653 ("prejudice is clear" where attorneys failed to investigate adequately client's mental health and present evidence of client's mental problems in sentencing phase); Zant v. Pitts, 436 S.E.2d 4 (Ga. 1993), overruled on other grounds by, Turpin v. Hill, 498 S.E.2d 52 (Ga. 1998) (trial counsel ineffective for failing to present defense of mental retardation where mental examinations showed that defendant mildly mentally retarded). We conclude that a

42

reasonable probability does exist that the jury would not have found that the statutory aggravating factors outweighed mitigating factors beyond a reasonable doubt.

In short, we find that because the appellant's attorneys failed to investigate and present evidence with respect to his mental condition, both the guilt and the sentencing phases of the appellant's trial were rendered fundamentally unfair. The appellant has met both prongs of the Strickland test.[23]

## VI. Cumulative Error & Conclusion

Lastly, the appellant complains that the cumulative effect of errors committed by his attorneys, the trial court, and the prosecution throughout the investigation, preparation, trial, and appeal of his case violated his rights under the Sixth, Eighth and Fourteenth Amendments, and Article I, Sections 6, 7, 8 ,9, 10, 16, 17, 19, and 20 of the Tennessee Constitution. When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice. See Harris by and through Ramseyer v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995), cert. denied, 490 U.S. 1075, 109 S.Ct. 2088 (1989) (citing Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984), cert. denied, 469 U.S. 1226, 105 S.Ct. 1221 (1985); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc), cert. denied, 440 U.S. 974, 99 S.Ct. 1542 (1979); United States v. Merrit, 528 F.2d 650, 651 (7th Cir. 1976) (per curium)). Counsel's failure to conduct adequate pretrial preparation and investigation suffices for a showing of prejudice. Counsel's constitutionally deficient actions, numerous throughout their representation of the appellant, collectively establish a prejudice of such magnitude that we can reach no

---

[23]As we find that the trial counsel's failure to conduct a reasonable investigation into the appellant's mental condition and history denied the appellant to effectively participate in the adversarial process, we need not individually address the issues of competency, sanity, and mental retardation. We again note, however, that the State concedes that counsel was ineffective regarding the presentation of proof at the mental retardation hearing.

conclusion other than the errors cumulatively prejudiced the appellant's right to a fair proceeding.  There is no hesitation in reaching our conclusion that there is a reasonable probability that, absent the deficiencies, the outcome of the trial might well have been different.  Indeed, the plethora and gravity of counsel's deficiencies rendered the entire proceeding fundamentally unfair.

Upon review of the entire record, we conclude that the evidence preponderates against the findings of the post-conviction court.  Butler, 789 S.W.2d at 899.  In consideration of the prejudice caused the appellant by trial counsel's failure to adequately investigate his mental condition and the prejudice resulting from the cumulative effect of counsel's numerous constitutional deficiencies in both the preparation and trial of this case, the judgment of the trial court denying post-conviction relief for the offense of first degree murder is reversed.[24]  A new trial is granted due to the glaring nature of counsel's ineffectiveness throughout all phases of this trial.

_____
DAVID G. HAYES, Judge

CONCUR:


_____
JOHN H. PEAY, Judge


_____
JOE G. RILEY, Judge

---

[24]Indeed, as observed by Justice Reid in his separate concurring/dissenting opinion in the direct appeal, "this [was a] poorly tried case."  Smith, 893 S.W.2d at 928